**Yashua PLAIR, Plaintiff,**

v.

**CITY OF NEW YORK; Commissioner Dora B. Schirro; Chief of Department Larry W. Davis, Sr.; Deputy Commissioner Florence Finkle; Supervising Warden of Division II Arthur Olivari; Warden Emmanuel Bailey; Officer Perez; John Does # 1–20, Defendants.**

No. 10 Civ. 8177.

United States District Court, S.D. New York.

May 31, 2011.

Harvis & Saleem LLP, by: Gabriel P. Harvis, Esq., New York, NY, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, by: Steve Stavridis, Esq., New York, NY, for Defendants.

## OPINION

SWEET, District Judge.

Defendants City of New York (the "City"), Dora B. Schirro ("Commissioner Schirro"), Larry W. Davis, Sr. ("Chief Davis"), Florence Finkle ("Deputy Commissioner Finkle") Arthur Olivari ("Warden Olivari") and Emmanuel Bailey ("Warden Bailey") (collectively, the "Supervisory Defendants") have moved to dismiss the complaint of plaintiff Yashua Plair (the "Plaintiff" or "Plair") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion is denied in part and granted in part as set forth below.

### Prior Proceedings

Plair filed his complaint against the City, the Supervisory Defendants, Officer Perez, and John Does # 1–20, on October 28, 2010. It alleges the following events.

On September 8, 2010, at approximately 8:30 p.m., Plair, a pre-trial detainee at the Robert N. Davoren Center adolescent jail on Rikers Island ("RNDC"), had a verbal disagreement with another inmate in his housing area. Complt. ¶¶ 27–28. Officer Perez sounded an alarm and a team consisting of approximately 8 armed DOC officers and 2 captains arrived, handcuffed Plair, and brought him to a hallway. Complt. ¶¶ 29–33. The officers surround-

ed Plair and, when he objected to a false account by Officer Perez of the events preceding the alarm, an unidentified captain punched Plair three times, resulting in fractures to both sides of his jaw and excruciating pain. Complt. ¶¶ 34–40. After informing his assailants that his jaw was broken, Plair was taken to a cell in RNDC's intake area and locked inside; his pleas for pain relievers and medical care, made both as he was placed in the cell and continuously for the next nineteen hours, were ignored. Complt. ¶¶ 41–46. During those nineteen hours, Plair specifically asked eight or more unidentified DOC staff in the intake area for medical treatment. Complt. ¶ 46.

At approximately 3:30 p.m. on the following day, Plair was taken to the Rikers Island onsite clinic, where he was administered Tylenol and x-rayed. Complt. ¶ 47. He was then transported to the Bellevue Hospital Prison Ward in a DOC bus. Complt. ¶ 48. After undergoing surgery and spending six days at the hospital, Plair was returned to Rikers Island and held at the NIC infirmary jail for ten days before being released. Complt. ¶¶ 51–52. As a result of the assault, DOC detained Plair for at least eight days beyond his scheduled release date. Complt. ¶ 52.

Plair has submitted, in addition by affidavit, the following:

(1) In the first 10 months of 2008, 39 inmates at RNDC suffered serious facial injuries—broken noses, broken jaws, or fractured eye sockets, records show. Twenty-eight of those inmates were teenagers. From October 2007 to October 2008, DOC's Chief of Department and Chief of Facilities Operations were receiving, but failing to act upon, regular reports concerning gang violence and extortion—some of it encouraged by correction officers at RNDC. Despite repeated mention at weekly staff meetings of a "disturbing trend" of violence at RNDC during that period, then-Chief of Facilities Operations Patrick Walsh "treated each incident as isolated and failed to act on the overall problem." A senior DOC official described the strategy enacted to combat violence at RNDC as a "Band–Aid approach" and stated that DOC leadership would "deal with the incident, but not see the big picture: that it was widespread throughout [RNDC]." Senior DOC officials "needed to break that culture and make this kind of thing unacceptable, but no one put it together. It's all on management and a lack of leadership." (See Graham Rayman, Rikers Fight Club: The Knockout Punch, VILLAGE VOICE, April 15, 2009).

(2) In February 2008, RNDC Correction Officer Lloyd Nicholson was arrested and subsequently indicted on charges that "he had ordered six inmates to beat two others in 2007 as part of a rogue disciplinary system that he and other guards called 'The Program.'" On August 6, 2010, a Bronx County Supreme Court Judge sentenced Mr. Nicholson to six years in prison and five years of post-release probation, noting at that time that he had found Mr. Nicholson's testimony "'unbelievable and contrived.'" (See Isolde Raftery, 6-Year Sentence for Guard in Rikers Island Beatings, N.Y. TIMES, August 7, 2010).

(3) On October 17, 2008, RNDC inmate Christopher Robinson was beaten to death by three other inmates, allegedly with the facilitation of RNDC staff. Mr. Robinson was murdered in his cell and "there are only two

ways in which Robinson's attackers could have entered his cell without his consent: Either the guards opened the door on purpose, or they left it open long after it should have been closed. The location of guards during the assault remains unclear." Following the assault and prior to his death, Mr. Robinson was denied medical treatment for as long as twelve hours. (*See* Graham Raman, Teen Murder at Rikers Jail, VILLAGE VOICE, Nov. 19, 2008.)

(4) In January 2009, three RNDC correction officers were indicted by the Bronx County District Attorney's Office. The officers were alleged to have "recruited inmates over three months [in 2008] to serve as 'managers, foot soldiers and enforcers' to maintain order [at RNDC]. The guards were also accused of training the inmates in how to restrain and assault their victims and deciding where and when attacks would occur." Two of the officers, Michael McKie and Khalid Nelson, are accused by prosecutors of having "[run] [RNDC] like an organized crime family" and face 25 years in prison on enterprise corruption charges. The third officer, Denise Albright, has been charged with, inter alia, assault and conspiracy. Just one month prior to Robinson's murder, an 18–year–old inmate named Alicedes Polance suffered a broken eye socket in a beating by a "team" of inmates [at RNDC] while [McKie, Nelson and Albright] were on duty, records show. In the aftermath, however, DOC officials failed to uncover the alleged scheme in time to prevent the fatal Robinson assault. (*See* Benjamin Weiser, Lawsuits Suggest Pattern of Rikers Guards Looking Other Way, N.Y. TIMES, Feb. 4, 2009.)

The instant motion was heard on February 2, 2011.

### *The 12(b)(6) Standard*

In assessing a Rule 12(b)(6) motion, the court must assume the truth of the well-pled factual allegations of the Complaint and must draw all reasonable inferences against the movant. *See, e.g., Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.2006); *Still v. De-Buono*, 101 F.3d 888, 891 (2d Cir.1996).

The traditional test on a Rule 12(b)(6) motion required that the Complaint not be dismissed unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Still*, 101 F.3d at 891 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Supreme Court has revisited the test, however, and a Complaint is now subject to dismissal unless its factual allegations, if credited, make the claim "plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Under this test, the court must look first to the well-pled factual allegations to determine whether they are plausible, and then determine whether those plausible allegations, if proven, suffice to establish liability. *See, e.g., Iqbal*, 129 S.Ct. at 1949–50. *Twombly* does not impose "a universal standard of heightened fact pleading, but … instead require[s] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007), rev'd on other grounds sub. nom. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173

L.Ed.2d 868 (2009) (emphasis omitted). In short, the pleading must " 'raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

In deciding a motion to dismiss, a court should consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Trans. Local 504*, 992 F.2d 12, 15 (2d Cir.1993). Additionally, "a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Vasquez v. City of New York*, 99 Civ. 4606, 2000 WL 869492, at *1 n. 1, 2000 U.S. Dist. LEXIS 8887, at *2 n. 1 (S.D.N.Y. Jun. 28, 2000) (citations omitted). *See also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993) ("consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.").

### The Motion to Dismiss the § 1983 Claims Against the Supervisory Defendants is Granted

Plaintiff does not allege that any of the Supervisory Defendants were involved in the September 8, 2010 incident underlying the Complaint. Therefore the only basis for Plaintiff's § 1983 claims against these defendants is his allegation that they "knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on plaintiff[,]" but failed to "take measures curb this pattern ..." resulting in an "acquiescence in the known unlawful behavior of their subordinates." Complt. ¶ 64.

The City and the Supervisory Defendants seek dismissal on the basis of the Supreme Court's ruling in *Ashcroft v. Iqbal*, 129 S.Ct. at 1949, wherein the Court held that a claim premised on a supervisor's "knowledge and acquiescence" in subordinates' wrongdoing is insufficiently stated. *Id.* The plaintiff/respondent in *Iqbal* brought a civil rights action against several high-ranking federal officials, including John Ashcroft (the former Attorney General of the United States) and Robert Mueller (the Director of the Federal Bureau of Investigation (FBI)), alleging that after the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result the plaintiff was unlawfully confined and subjected to harsh treatment. 129 S.Ct. at 1951. The plaintiff there argued that "under a theory of "supervisory liability," the Attorney General and FBI Director could be held liable for their "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." " *Id.* at 1949. The Supreme Court dismissed this argument, holding that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* The Court went on to hold that for plaintiff to "prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post–September–11 detainees as 'of high interest' because of their race, religion, or national origin." *Id.* at 1952. Having failed in this respect, the Supreme Court held that the complaint failed to state a claim for intentional discrimination with

respect to the Attorney General or the FBI Director.

Prior to *Iqbal,* the controlling authority on supervisory liability was *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), which held that liability "may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

Following *Iqbal,* courts in this district have held that a defendant cannot be held liable under section 1983 unless that defendant took an action that deprived the plaintiff of his or her constitutional rights. *See, e.g., Joseph v. Fischer,* 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42–43 (S.D.N.Y. Oct. 7, 2009) ("[p]laintiff's claim, based on [a supervisor's] failure to take corrective measures, is precisely the type of claim *Iqbal* eliminated."); *Bellamy v. Mount Vernon Hosp.,* 07 Civ. 1801, 2009 WL 1835939, at *6, 2009 U.S. Dist. LEXIS 54141, at *27–28 (S.D.N.Y. Jun. 26, 2009) (holding that *Iqbal* eliminated supervisory liability previously permitted by *Colon* in situations where the supervisor "knew of and acquiesced to a constitutional violation committed by a subordinate"); *Newton v. City of New York,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("passive failure to train claims pursuant to § 1983 have not sur-

vived the Supreme Court's recent decision in [*Iqbal* ]").

The claims in *Iqbal* involved, inter alia, denial of equal protection and discrimination, which require proof of discriminatory intent, *Iqbal,* 129 S.Ct. at 1948 (citation omitted). In that context, with intention-based constitutional claims in mind, the Supreme Court held that a supervisor's "mere knowledge of his subordinate's discriminatory purpose" does not amount to the supervisor's violating the constitution. *Id.* at 1949. However, "the factors necessary to establish a *Bivens* [*v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ] violation will vary with the constitutional provision at issue." *Id.* at 1948.

■ Here, the underlying constitutional right of the inmate is to be free from the use of excessive force by his jailers. In such a case, I conclude that the traditional *Colon* categories of supervisory liability still apply. *See Jackson v. Goord,* 664 F.Supp.2d 307, 324 & n. 7 (S.D.N.Y.2009) (holding Colon standard is unaffected by *Iqbal* in deliberate indifference case, because *Iqbal* "involved discriminatory intent."). Following *Iqbal,* other judges in the Second Circuit have continued to cite all five of the *Colon* categories as the bases for establishing supervisory liability in cases alleging violations of a plaintiff's Fourth and Eighth Amendment rights. *See, e.g., Id.; Gordon v. City of New York,* 09 Civ. 3908, 2009 WL 3878241, at *2 (E.D.N.Y. Nov. 18, 2009); *Dowdy v. Hercules,* 07 Civ. 2488, 2010 WL 169624, at *6 (E.D.N.Y. Jan. 15, 2010); *Garcia v. Watts,* 08 Civ. 7778, 2009 WL 2777085, at *12 (S.D.N.Y. Sept. 1, 2009); *Swain v. Doe,* 04 Civ. 1020, 2009 WL 3151183, at *5 (D.Conn. Sept. 24, 2009).

*Bellamy,* 2009 WL 1835939, at *6, 2009 U.S. Dist. LEXIS 54141, at *27–28, *Jo-*

seph, 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42–43, and *Newton*, 640 F.Supp.2d at 448, cited by the city and the Supervisory Defendants, did not focus on the specific role that discriminatory intent played in *Iqbal*. Subsequent decisions have noted that *Bellamy, Joseph, Newton*, and similar rulings "may overstate *Iqbal's* impact on supervisory liability" and held that "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *See Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009); *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 347 (S.D.N.Y.2010); *Qasem v. Toro*, 737 F.Supp.2d 147, 151 (S.D.N.Y.2010) (declining to adopt the "narrow interpretation of *Iqbal*" advanced by *Bellamy, Joseph* and *Newton* ).

In this action *Colon* remains the standard for establishing personal involvement by supervisory officials under 42 U.S.C. § 1983.

■ Here, the Complaint attempts to state a claim under the third *Colon* category; each of the supervisors is alleged to have received extensive information concerning the City's pattern of incidents involving unnecessary and excessive force to inmates and the failure of the DOC to prohibit its staff from using such force, and the Supervisory Defendants are alleged to have failed to take any steps to curb those unconstitutional abuses. Complt. ¶¶ 11–15. They are alleged to have allowed the continuation of a policy or custom under which the unconstitutional practice of using excessive force against inmates incarcerated in the City's jails has occurred. *See, e.g., Jean–Laurent v. Wilkerson*, 438 F.Supp.2d 318, 326 (S.D.N.Y. 2006) (denying motion to dismiss, holding that complaint's allegation that Commissioner Martin Horn authorized correction officers to maintain a custom or practice that authorized the use of physical force against inmates "clearly falls into the third *Colon* category").

However, Plaintiff's allegations of the existence of a policy or custom are conclusory and do not reach the requisite level of plausibility to survive under *Twombly* and *Iqbal*. See *Iqbal*, 129 S.Ct. at 1937 (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). In the Complaint, Plaintiff points to two cases of violence that occurred several years prior to the alleged violence against him and the existence of reports from unspecified time periods which would have reported violence at New York City detention facilities. Complt. ¶¶ 19–22. He conclusorily alleges that these prior incidents established a policy or custom of violence against prisoners, and that the Supervisory Defendants were aware of and allowed this policy to continue. Complt. ¶¶ 13–26. Given the passage of time and the installation of a new DOC Commissioner and other supervisory staff between the prior violent incidents and the alleged abuse of Plaintiff, as well as the general failure of Plaintiff to plausibly allege that a policy or custom underlay these acts of violence, Plaintiff has not sufficiently alleged that the violence which harmed him was part of a larger policy or custom at the DOC.[1] *See, e.g., Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (holding that, in the First Amendment retaliation context,

---

1. Plaintiff's submission of newspaper articles about the "Program" at New York City Detention Facilities, through which inmates committed acts of violence against each other at the behest of prison staff, does not affect this holding. Plaintiff does not allege that the abuse he was subjected to was related to the "Program."

"[t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases." (quoting *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir.2001)); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.2009)) (internal quotations omitted); *Carson v. Lewis*, 35 F.Supp.2d 250, 269 (E.D.N.Y.1999) (in summary judgment context, denying admissibility of a 1989 report because "the passage of time between the issuance of the SIC [State Investigation Committee] Report and the events in question sufficiently attenuates its trustworthiness and renders it inadmissible"); *compare Gentile v. County of Suffolk*, 129 F.R.D. 435 (E.D.N.Y.1990), aff'd, 926 F.2d 142 (2d Cir. 1991) (admitting same SIC Report when issued on eve of trial).

Plaintiff has therefore failed to state a claim under Colon against the Supervisory Defendants.

### The Motion to Dismiss the State Law Claims Against the Supervisory Defendants is Denied

■ According to the Supervisory Defendants, New York law bars lawsuits against prison employees in their personal capacity for damages arising out of "any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." N.Y. Correct. Law § 24 (McKinney's 2010). *See Baker v. Coughlin*, 77 F.3d 12, 14–15 (2d Cir.1996) (holding that even though § 24 only refers to actions in state court, it applies to state claims brought in federal court). The Supervisory Defendants also contend that the Eleventh Amendment to the U.S. Constitution bars Plaintiff from suing officials under New York law in their official capacities.

The Plaintiff alleges, pursuant to New York State law, claims of (1) Assault and Battery; (2) False Imprisonment; (3) Intentional Infliction of Emotional Distress; (4) Negligent Infliction of Emotional Distress; and (5) Negligent Hiring, Training and Retention of Employment Services.

■ "It is well settled that Section 24 shields employees of a *state* correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope of the statute." *Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir.1997) (emphasis added); *see also Joy v. New York*, 09 Civ. 841, 2010 WL 3909694, *4 (N.D.N.Y. Sept. 30, 2010). However, by its text, Section 24 does not apply to the City's correctional employees. *See Martinez v. Robinson*, 99 Civ. 11911, 2001 WL 498407, *4 (S.D.N.Y. May 10, 2001) ("Thus, the text of Section 24, especially when read together with other relevant statutes, indicates that it does not shield employees of the New York City Department of Correction from liability."). *See also Ismail v. Singh*, 3 Misc.3d 188, 776 N.Y.S.2d 166, 169 (N.Y.Sup.2003) ("The legitimate purpose of Corrections Law § 24 is to preserve order and safety within New York State penal facilities.")

■ In addition, Plaintiff's state law claims assert liability against the City of New York for the tortious conduct of the individual Defendants on a respondeat superior basis. Complt. ¶¶ 73, 78, 83, 88, 91–95. Section 24 does not impact suits against the Defendants' employer, the City of New York, for their conduct. *See* N.Y. Correct. Law § 24.

■ Furthermore, "[w]hile states are protected by the Eleventh Amendment from suits brought by a private party, municipalities are not." *Sorrentino v.*

*Outhouse,* 03 Civ. 104, 2006 WL 2052307, *8 (N.D.N.Y. Jul. 21, 2006) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

 Defendants seek dismissal of Plaintiff's claim against the City for its negligent hiring, training and retention of the individual Defendants on the grounds that such a claim is barred where the challenged action occurred within the scope of employment. Plaintiff concedes that the City cannot be liable for the negligent hiring, training and retention of the Supervisory Defendants if the City agrees that the individual defendant's actions were undertaken in the scope of their employment. *See Kramer v. City of New York,* 04 Civ. 106, 2004 WL 2429811, *12 (S.D.N.Y. Nov. 1, 2004).

Pursuant to New York General Municipal Law § 50–k, a determination by the New York City Corporation Counsel as to whether an employee was acting within the scope of his or her employment occurs only after the employee delivers the complaint to the New York City Law Department. *See* N.Y. Gen. Mun. Law § 50–k(2) (McKinney's 2010). As Plaintiff has not served Officer Perez or identified the John Does, the New York City Corporation Counsel has not yet made his determination. An issue of fact "appropriate for a jury" thus may be presented. *Rowley v. City of New York,* 00 Civ. 1793, 2005 WL 2429514, *13 (S.D.N.Y. Sept. 30, 2005); *see also Spitz v. Coughlin,* 161 A.D.2d 1088, 557 N.Y.S.2d 647, 648 (N.Y.App.Div.1990) (finding intentional misconduct by correction officer to be outside scope of employment). Accordingly, Plaintiff's claim against Defendant City for negligent hiring, training and retention is not dismissed.

### The Motion to Dismiss the Monell Claim is Granted

 To prevail on a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must show that a municipal policy or custom caused the deprivation of his constitutional rights. *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may not be held liable under § 1983 on the basis of respondeat superior. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Rather, "[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries.... Second, the plaintiff must establish a casual connection—an 'affirmative link'—between the policy and deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985), cert. denied, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 & n. 8, 828, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Therefore, in order to establish municipal liability, plaintiff must establish that an identified municipal policy or practice was the "moving force [behind] the constitutional violation." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. *See also Anderson v. City of New York,* 657 F.Supp. 1571, 1575–76 (S.D.N.Y.1987) (A plaintiff also "must link the behavior in question to the policy of failure to discipline—for example, the officer must have known of the policy at the time he allegedly committed the civil rights violations."); *see also Batista v. Rodriguez,* 702 F.2d 393, 398 (2d Cir.1983) ("The Fourth Count ... does not claim that the alleged unlawful arrests and assault of November 8, 1976, were the product of the City's alleged policy and practice or that the policy was even a substantial factor leading to those injuries....") (citation omitted).

 As to the issue of what a complaint must allege to survive a motion to dismiss, the Second Circuit has held that

" 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993). However, in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court "held that a federal court may not apply a 'heightened pleading standard' in civil rights cases alleging municipal liability under section 1983." *Rheingold v. Harrison Town Police Dept.,* 568 F.Supp.2d 384, 394 (S.D.N.Y.2008) (citing *Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160). Following *Iqbal* and *Twombly, Monell* claims must satisfy the plausibility standard:

> It is questionable whether the boilerplate *Monell* claim often included in many § 1983 cases, including this one, was ever sufficient to state a claim upon which relief could be granted. *See Smith v. City of New York,* 290 F.Supp.2d 317, 322 (E.D.N.Y.2003) (holding that a conclusory, boilerplate assertion of a municipal policy or custom was insufficient to survive motion to dismiss). In light of *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), it is now clear that such boilerplate claims do not rise to the level of plausibility.

*Santiago v. City of New York,* 09 Civ. 856, 2009 WL 2734667, at *3, 2009 U.S. Dist. LEXIS 75372, at *7 (E.D.N.Y. Aug. 18, 2009) (dismissing *Monell* claim). *See also In re Dayton,* 09–CV–8140 (KMK), 786 F.Supp.2d 809, 822–23, 2011 WL 2020240, at *11 (S.D.N.Y. Mar. 31, 2011) (dismissing Monell claim where factual assertions in complaint were "too conclusory" and constituted a "boilerplate recitation of the elements of a *Monell* claim"); *Abreu v. City of New York,* 657 F.Supp.2d 357, 360–61 (E.D.N.Y.2009) ("[The plaintiff's] complaint succinctly states one of the core legal concepts animating *Monell* liability. But it does absolutely nothing else"); *Brodeur v. City of New York,* 99 Civ. 661, 2002 WL 424688, at *2–3, 2002 U.S. Dist. LEXIS 4500, at *7 (S.D.N.Y. Mar. 18, 2002) (court dismissing complaint against City where complaint "flatly asserts a policy but contains no factual allegations sufficient to establish a municipal policy or custom"); *George v. Burton,* 00 Civ. 143, 2001 WL 12010, at *2, 2001 U.S. Dist. LEXIS 24, at *5–6 (S.D.N.Y. Jan. 4, 2001) (court dismissing complaint with prejudice where plaintiff "failed to proffer any facts in his complaint from which we can infer such a pattern or practice").

■ Here, the complaint lacks sufficient factual details concerning *Monell* liability and contains boilerplate allegations of unconstitutional policies and practices. *See* Complt. ¶¶ 67–68. Specifically, Plaintiff conclusorily alleges that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of plaintiff's beatings [which] constituted a municipal policy, practice or custom and led to plaintiff's assault." Complt. ¶ 67.

Plaintiff asserts in his opposition brief that "[f]ar from mere boilerplate, Plaintiff's Complaint outlines with specificity the factual basis for his constitutional deprivations and injury (¶¶ 19–57), the official policy or custom they resulted from (¶¶ 10–15) and a 'causal link' between them (¶¶ 67–69)." Defendants dispute this assertion, except with respect to Plaintiff's allegations concerning how the incident unfolded (Complt. ¶¶ 27–57).

As discussed above in reference to Plaintiff's claims under *Colon,* the prior

violent incidents relied upon by Plaintiff are too attenuated and isolated from his own injury to plausibly establish (a) a policy or custom of violence against prisoners, and (b) that his injury was linked to that policy or custom. Plaintiff relies on conclusory allegations to fill the gaps in his complaint, rendering his *Monell* allegations insufficient under *Iqbal* and *Twombly.*

■ Furthermore, it is well established that a single incident does not give rise to an unlawful practice by subordinate officials "so permanent and well-settled as to constitute 'custom or usage.' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see also Sorlucco v. New York City Police Department,* 971 F.2d 864, 870 (2d Cir.1992) (municipality may not be held liable under Section 1983 for isolated unconstitutional acts of its employees) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); *Anderson,* 657 F.Supp. at 1574 ("plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Therefore, Plaintiff's *Monell* claim is dismissed.

### Conclusion

For the foregoing reasons, the Supervisory Defendants' motion to dismiss is granted in part and denied in part. Plaintiff is granted leave to file an amended complaint within 60 days of this order.

It is so ordered.